ANDREW CRISPO GALLERY,
INC., Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee.

No. 1766, Docket 93–4036.

United States Court of Appeals,
Second Circuit.

Argued June 23, 1993.

Decided Feb. 22, 1994.

Walter J. Rockler, Washington, D.C. (Julius M. Greisman, David P. Gersch, Anthony N. O'Brien, Susan K. Matlow, Arnold & Porter, Washington, D.C., of counsel), for Petitioner–Appellant.

Kenneth W. Rosenberg, U.S. Department of Justice, Tax Division, Washington, D.C. (Michael L. Paup, Acting Assistant Attorney General, Gary R. Allen, Gilbert S. Rothenberg, U.S. Department of Justice, Tax Division, Abraham N. Shashy, Office of Chief Counsel, Internal Revenue Service, Washington, D.C., of counsel), for Respondent–Appellee.

Before: NEWMAN, Chief Judge, VAN GRAAFEILAND and ALTIMARI, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Andrew Crispo Gallery, Inc. ("Crispo Gallery" or "the Gallery") appeals from a decision of the United States Tax Court (Cohen, J.) which determined a deficiency of $2,001,792.14 in income tax for the 1987 taxable year. For the reasons that follow, we affirm in part and vacate and remand in part.

Crispo Gallery began operations in New York City in 1973. It bought and sold artwork for its own account, sold artwork on consignment, and held art exhibitions. It did not sell by way of auction. Andrew Crispo became the Gallery's president and sole shareholder in 1980, and thereafter managed all of its affairs.

Between 1975 and 1982, Crispo Gallery transferred numerous works of art to RNB Leasing Corporation and Sovereign American Arts Corporation ("the Ackerman entities"), both managed by Martin and Diane Ackerman. The transfers secured loans that the Ackerman entities made to Crispo Gallery. The Ackerman entities agreed to transfer each of the works of art back to the Gallery for a price equal to the original loan amount plus interest, which, not surprisingly, was at a usurious rate. Crispo Gallery made periodic payments as required by the transactions until some time in 1982.

■ Although the transfers were recorded on invoices, Crispo Gallery and the Ackerman entities repeatedly described the transactions as loans in their records and correspondence. Crispo Gallery paid insurance and storage costs for the artwork while it was in possession of the Ackerman entities. The Tax Court properly concluded that "these transactions were secured loans, not sales." *Andrew Crispo Gallery, Inc. v. Commissioner*, 63 T.C.M. (CCH) 2152, 2162, 1992 WL 31221 (1992).

During 1982, the Ackerman entities began to sell some of the artwork when Crispo Gallery failed to make required payments. In 1983, Andrew Crispo and Crispo Gallery brought an action in New York State Supreme Court against the Ackermans and the Ackerman entities to recover some of the transferred works. The court dismissed the suit in January 1985 because Crispo refused to comply with discovery. The Appellate Division affirmed the judgment of dismissal, and the New York State Court of Appeals declined to hear the case in October 1986. For tax purposes, this decision of the Court of Appeals finally determined that Crispo Gallery had no legal right of recovery.

In 1984, Crispo Gallery was the subject of a federal investigation for tax fraud spanning the years 1979 to 1982, and substantially all of its records were subpoenaed by the government. In 1985, Andrew Crispo pled guilty to an information charging him with aiding and abetting corporate income tax fraud. He was incarcerated from April 1986 until July 1989. During this time, Gallery representatives repeatedly requested the return of the subpoenaed records. The Department of Justice returned some of the records in 1987 and 1988, but they were in a sad state of disarray. Moreover, many of the records relevant to the Gallery's tax reporting had been lost, including the ledger account listing the cost and disposition of all works in inventory.

In March 1985, one of Crispo Gallery's principal creditors, Rosenthal and Rosenthal, exercised a lien and seized all artwork owned by the Gallery. In 1986, the Internal Revenue Service seized all of the Gallery's property, including the artwork in the hands of Rosenthal and Rosenthal. In November and December 1987, Sotheby's, Inc. sold some of the seized artwork at auction pursuant to a Consignment Agreement with the IRS. The purchasers of the artwork paid for it in 1988.

In Crispo Gallery's 1986 income tax return, it claimed a $928,000 loss based on the artwork not recovered from the Ackerman transactions. There is no dispute as to the cost to the Gallery of each painting that was lost in these transactions. The Tax Court held, however, that the Gallery had failed to show that it had not previously deducted or otherwise recovered the costs on which it is claiming a loss and that therefore the Gallery could not deduct the cost of the unrecovered works.

In its 1987 tax return, Crispo Gallery claimed a net operating loss carryover of $3,139,890 from the taxable year 1986. Part of this loss involved the $928,000 deduction for the Ackerman transactions and certain 1986 business expense deductions. The Gallery also reported its gross profits from the Sotheby's sales as $2,092,675, but deferred recognition of all but $74,260 of that amount until the 1988 taxable year by classifying the transactions as installment sales under Internal Revenue Code section 453.

On May 12, 1988, the Commissioner sent Crispo Gallery a statutory notice of deficiency for the 1987 taxable year pursuant to a purported termination assessment under section 6851 of the Code.[1] The notice asserted a deficiency in the amount of $2,559,639.13. Among other things, it disallowed the deduction of the net operating loss carryover from 1986, stating:

> The amount of $3,139,890.00 claimed as a net operating loss carryover deduction from the taxable year ended December 31, 1986 is disallowed at this time pending completion of the examination for year 1986 currently in process to determine whether any or all of the losses claimed will be allowable.

The notice also denied the deferred recognition of the asserted installment sales income, thereby adding $3,154,240 to the gross receipts for the 1987 taxable year.

Crispo Gallery appealed to the Tax Court for a redetermination of the deficiency. Prior to trial, the Gallery moved to dismiss the disallowance of the net operating loss carryover on the ground that the above-quoted

---

1. It is far from clear that the termination assessment, made after the IRS had seized all of Crispo Gallery's artwork and while Andrew Crispo was incarcerated and not about to "quickly" depart the country, satisfies the issuance requirements of section 6851. *See Garzon v. United States,* 605 F.Supp. 738, 745–46 (S.D.Fla.1985).

notice of deficiency concededly was provisional in nature. The Court denied the motion.

In a memorandum opinion filed February 24, 1992, *see* 63 T.C.M. (CCH) 2152, 1992 WL 31221, the Tax Court reaffirmed its ruling that the notice of deficiency was valid and held that the Gallery had the burden of proving entitlement to any deductions claimed. Judge Cohen also held that the Gallery was required to include the income from the Sotheby's auction in its gross receipts for the 1987 taxable year. She held that the auction sales were not installment sales, and she ruled that Crispo Gallery had not given the Commissioner adequate notice of its alternative claim that the gross receipts from the sales should be included in 1988 income because the sales were not complete until 1988. Judge Cohen also disallowed the 1986 net operating loss carryover deduction to the extent it was based on miscellaneous business expenses and the losses arising from the Ackerman transactions.

Pursuant to the Tax Court's opinion, the parties submitted an agreed computation of deficiency under Tax Court Rule 155. On November 20, 1992, the Tax Court entered a decision determining a deficiency in income tax due from Crispo Gallery for the taxable year 1987 in the amount of $2,001,792.14.

■ Crispo Gallery contends on appeal that the May 1988 notice of deficiency was invalid because it failed to comply with the requirements of Code sections 6212(a) and 6213(a). Section 6212(a) authorizes the Secretary of the Treasury or his delegate to send a taxpayer a notice of deficiency if the Secretary "determines that there is a deficiency in respect of any tax imposed." Section 6213(a) provides in part that "the taxpayer may file a petition with the Tax Court for a redetermination of the deficiency" and "[t]he Tax Court shall have no jurisdiction to enjoin any action or proceeding under this subsection unless a timely petition for a redetermination of the deficiency has been filed."

■ Although the Code does not prescribe the appropriate content of a notice of deficiency, at a minimum it must identify the taxpayer, indicate that the Commissioner has made a determination of deficiency, and spec-

ify the taxable year and amount of the deficiency. *See Estate of Yaeger v. Commissioner,* 889 F.2d 29, 35 (2d Cir.1989), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). Crispo Gallery contends that the Commissioner failed to make a proper determination of a tax deficiency. It argues that the disallowance was made without any examination or consideration of the loss carryover and was tentative in nature; that the notice itself declared that the statutorily required determination was being deferred until some future date.

In support of its arguments concerning the asserted absence of the examination needed for a determination, Crispo Gallery cites principally to *Scar v. Commissioner,* 814 F.2d 1363 (9th Cir.1987) and *Kong v. Commissioner,* 60 T.C.M. (CCH) 696, 1990 WL 127133 (1990). These cases are distinguishable. In *Scar,* the Commissioner sent the taxpayers a notice of deficiency disallowing certain deductions that the taxpayers never had claimed and taxing the deficiency at the highest marginal rate. 814 F.2d at 1364–66. In *Kong,* the taxpayer received a deficiency notice disallowing a deduction for a partnership loss and stating: " 'In order to protect the government's interest and since your original income tax return is unavailable at this time, the income tax is being assessed at the maximum rate of 70 percent.' " 60 T.C.M. (CCH) at 697. Both courts held that the Commissioner had made no determination of deficiency because the notice of deficiency in each case revealed on its face that it had been issued without any prior inspection of the taxpayer's income tax return. 814 F.2d at 1370; 60 T.C.M. (CCH) at 697–99.

■ In the instant case, the Tax Court found that the Commissioner "examined [Crispo Gallery's] Federal income tax return for 1987 prior to issuing the notice of deficiency and disallowed the deduction for the net operating loss carryover from 1986 based on that examination." 63 T.C.M. (CCH) at 2158. We review the Tax Court's factual findings under a deferential standard and will reverse only if our own review of the record convinces us that the Tax Court clearly erred in making those findings. *See Commissioner v. Duberstein,* 363 U.S. 278, 291,

80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960). There was no such error here.

Crispo Gallery relies upon *Abrams v. Commissioner,* 787 F.2d 939 (4th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986), and a series of related tax shelter cases in support of its argument that the Commissioner in the instant case made no determination of deficiency because the disallowance of the carryover deduction was tentative and subject to later modification. The issue in the cited cases was whether pre-filing letters concerning the anticipated disallowance of tax shelter deductions could be treated as notices of deficiency. The courts consistently held that they could not. *See Abrams, supra,* 787 F.2d at 941–42; *see also Gaska v. Commissioner,* 800 F.2d 633, 634–35 (6th Cir.1986). These cases are inapposite. In short, Crispo Gallery received a valid notice of deficiency.

*The Ackerman Transaction Losses*

■ In an action challenging a determination of tax deficiency, a deficiency notice carries a presumption of correctness requiring the taxpayer to prove by a preponderance of the evidence that the Commissioner's determination was erroneous. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Schaffer v. Commissioner,* 779 F.2d 849, 857–58 (2d Cir.1985). Crispo Gallery does not challenge the general applicability of this rule. It contends that the rule should not be applied where, as here, the government has seized and failed to return many of the taxpayer's records needed to support the claimed deductions. Although this contention has an obvious sympathetic appeal, it is without support in the law. As the Supreme Court has stated on a number of occasions, the allowance of deductions does not turn upon general equitable considerations. *See, e.g., Deputy v. du Pont,* 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1940). "The impossibility of proving a material fact upon which the right to relief depends, simply leaves the claimant upon whom the burden rests with an unenforceable claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof." *Burnet v. Houston,* 283

U.S. 223, 228, 51 S.Ct. 413, 415, 75 L.Ed. 991 (1931). *See also Rodman v. Commissioner,* 542 F.2d 845, 854 (2d Cir.1976).

■ Unfortunately, the attorneys and the Tax Court combined to make this case much more complicated than it should have been. From the outset, the Commissioner's theory of the Ackerman transactions was that they were sales, not loans. The Gallery, on the other hand, argued that they were loans. Much ink was spilled, both in the Tax Court and in this Court, in arguing the merits of these two contentions, which the Tax Court eventually resolved in the Gallery's favor. Under the heading "Section 165 Losses" the Tax Court wrote:

> Respondent contends that petitioner's transactions with RNB and Sovereign (the Ackerman entities) were sales and that petitioner is therefore not entitled to deduct losses therefrom under section 165. Petitioner argues that the transactions were loans.
>
> The intention of the parties, to be determined based on all of the surrounding facts and circumstances, not only the form of the transaction, is determinative of the characterization of such transactions. *United National Corp. v. Commissioner* [Dec. 9184], 33 B.T.A. 790, 794 (1935).
>
> Each sale from petitioner to the Ackerman entities was accompanied by an option to repurchase at the original sales price as long as yearly or monthly option payments were made. The benefit to the Ackerman entities would arise from the option payments, rather than from any potential appreciation in the artwork. The sales prices were approximately 50 percent of the cost of the artwork. Petitioner paid the storage and insurance on the artwork sold to the Ackerman entities. Sovereign described such transactions as loans in its Securities and Exchange Commission filings. The Ackerman entities referred to the transactions as loans in correspondence with petitioner. We therefore conclude that these transactions were secured loans, not sales.

63 T.C.M. (CCH) at 2162.

The above holding, however, turned out to be a hollow victory for the Gallery. During

the trial, counsel for the Gallery made clear his belief that the Gallery could use the original cost of the lost paintings as the basis for its loss. So far as we can see from the truncated record, the Tax Court did not disabuse counsel of this belief until it wrote its opinion:

> Petitioner has provided the cost to it of each work of art that was lost. This evidence is insufficient, however, to show that it did not previously deduct or otherwise recover the cost of the works of art on which it is claiming a loss. Petitioner has produced no books or records that reflect its adjusted basis in the works of art lost to the Ackerman entities. Petitioner has failed to meet its burden of proof and may not deduct the cost of the unrecovered works of art.

*Id.* at 2162–63.

■ It is quite apparent that the efforts of the parties in the Tax Court were directed principally to the issue of whether the transactions between the Gallery and the Ackerman entities constituted sales or loans. We must confess to considerable uncertainty, therefore, as to what the Tax Court had in mind by its above-quoted reference to the deduction or recovery of the cost of the paintings and the adjusted basis presumably resulting therefrom. The Gallery's purchases and sales were not made by compensated agents, but by Andrew Crispo himself. The very nature of the Gallery's transactions with the Ackermans strongly indicates that the paintings were free of liens or other encumbrances. The paintings were not used in the Gallery's business or held for the production of income. They were works of art with no determinable life expectancy, and also, in some respects, stock in trade. Accordingly, we do not picture them as being subject to depreciation. *See* 5 Mertens, *The Law of Federal Income Taxation* §§ 23A.26, 23A.27, 23A.30; Rev.Rul. 68–232, 1968–1 C.B. 79. Generally speaking, depreciation reflects the cost of an existing capital asset. *United States v. Chicago, Burlington & Quincy R.R. Co.,* 412 U.S. 401, 415, 93 S.Ct. 2169, 2177, 37 L.Ed.2d 30 (1973); *see also Fribourg Navigation Co. v. Commissioner,* 383 U.S. 272, 276, 86 S.Ct. 862, 865, 15 L.Ed.2d 751 (1966).

■ The Gallery, and this Court as well, are entitled to know the basis of law and fact on which the Commissioner based his finding of deficiencies. *See Helvering v. Tex–Penn Oil Co.,* 300 U.S. 481, 498, 57 S.Ct. 569, 577, 81 L.Ed. 755 (1937). The same should be no less true where, as here, the contours of the basis were articulated by the Tax Court. The Gallery's inability to produce the books and records which the government seized and did not return is not a sufficient reason, in and of itself, to reject the Gallery's claim of loss. Secondary proof is admissible when records unavoidably are lost. *See Malinowski v. Commissioner,* 71 T.C. 1120, 1124–25 (1979). As a practical matter, however, it is not easy to prove a negative. *Elkins v. United States,* 364 U.S. 206, 218, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). This is particularly true where, as here, the negative to be proven has not been specifically identified. It may be that, if the Gallery were enlightened as to the nature of the deductions or recoveries that concerned the Tax Court, it could satisfy the Court concerning their nonexistence or their amount.

We note that the stipulation between the Gallery and the Commissioner provided that the Gallery's profit from the Sotheby's sales of paintings should be computed by reference to the paintings' original costs. The stipulation provided that it was not intended to "represent Petitioner's basis in the artwork for purposes of claiming a loss from their disposition." It may be that, to save trial time, the parties were content to adopt a simplified, albeit improper, method of determining profits from the paintings' sales. On the other hand, it is possible that the adjustments needed to establish a cost basis were so small as to warrant little consideration. Whatever the reason, it seems somewhat incongruous to determine the cost basis of paintings in one way in establishing a loss and to determine it in another way in establishing a profit.

Apparently the Commissioner is in as much doubt as is this Court in deciding what the tax judge had in mind when she referred to deductions and recovery of costs. The Commissioner suggests on appeal that, when

the tax judge referred to possible prior write-offs, she was referring to the Ackerman transactions themselves, i.e., that the Gallery may have deducted losses when it transferred the paintings to the Ackermans. We find this suggestion unpersuasive. In the first place, if the tax judge was referring to the Ackerman transactions, she easily could have said so. Secondly and more importantly, the tax judge held that the Ackerman transactions constituted loans, not sales. *Cf. Paccar, Inc. v. Commissioner*, 849 F.2d 393, 396–99 (9th Cir.1988). Under such circumstances, there was no room for loss deductions.

Recognizing as we do that the burden of establishing deductions is on the taxpayer, we hold that under the peculiar circumstances of the instant case, the taxpayer had sufficiently crossed the threshold of proof to require that it be given more specific notice of alleged inadequacies and an opportunity to remedy the asserted inadequacies by secondary proof, if available. Although we do not subscribe to the Gallery's contention that the issue of possible prior deductions and cost recoveries should have been pleaded by the Commissioner under Tax Court Rule 39, we are concerned as to whether the issue was clearly and adequately raised and alternate possibilities of proof taken into consideration in the Tax Court's rulings.

■■■ Moreover, since the government has lost some of the taxpayer's records on which the taxpayer alleges it would have relied to satisfy the Tax Court that no part of the claimed losses had not been previously recovered, my panel colleagues believe that some adjustment is warranted in the manner in which the taxpayer may discharge its burden of persuasion. It is true that the allowance of deductions does not turn on equitable considerations, *see, e.g., Deputy v. du Pont, supra*, 308 U.S. at 493, 60 S.Ct. at 366, and that normally "[t]he impossibility of proving a material fact upon which the right to relief depends, simply leaves the claimant upon whom the burden rests with an unenforceable claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof." *Burnet v. Houston, supra*, 283 U.S. at 228, 51 S.Ct. at 415.

*See also Rodman v. Commissioner, supra*, 542 F.2d at 854. Furthermore, the burden of proof with respect to deductions remains on the taxpayer despite the unintentional loss of records, whether the loss was caused by the taxpayer, *see, e.g., id.* at 852–54; *Jones v. Commissioner*, 56 T.C.M. (CCH) 603, 604, 1988 WL 118614 (1988); *Gross v. Commissioner*, 25 T.C.M. (CCH) 639, 646, 1966 WL 883 (1966), a third party, *see, e.g., Thorpe v. Commissioner*, 63 T.C.M. (CCH) 2448, 2451, 1992 WL 50958 (1992); *Morrison v. Commissioner*, 53 T.C.M. (CCH) 251, 256, 1987 WL 40173 (1987); *Mueseler v. Commissioner*, 49 T.C.M. (CCH) 8, 9, 1984 WL 15220 (1984), or an external force, *see, e.g., Cady v. Commissioner*, 59 T.C.M. (CCH) 689, 690, 1990 WL 69241 (1990).

■■■ The issue for us is whether any adjustment to the manner in which a taxpayer discharges his burden of persuasion is warranted where the loss is caused by the government's own actions in first seizing and then losing the taxpayer's records. Though the Tax Court apparently would make no adjustment in such circumstances, *see, e.g., Visser v. Commissioner*, 65 T.C.M. (CCH) 1734, 1736 n. 8, 1993 WL 3970 (1993); *Cook v. Commissioner*, 62 T.C.M. (CCH) 1339, 1341–42, 1991 WL 251524 (1991); *American Police and Fire Foundation, Inc. v. Commissioner*, 81 T.C. 699, 707–09, 1983 WL 14886 (1983); *Malinowski v. Commissioner*, 71 T.C. 1120, 1125, 1979 WL 3606 (1979), the precise issue has not yet been resolved by an appellate court.

■■■ Chief Judge Newman and Judge Altimari are of the view that some adjustment is required in such circumstances. Where the government itself has been responsible for the taxpayer's inability to produce documents necessary to prove some aspect of his entitlement to deductions, they do not consider that circumstance to be the sort of "misfortune" that must be "borne" by the taxpayer, as it would normally be in other cases "as a result of a failure of proof." *See Burnet v. Houston, supra*, 283 U.S. at 228, 51 S.Ct. at 415. In their view, two modifications are appropriate. First, where the taxpayer's records have been seized and lost by the government, the trier should at least be permitted to infer that the true facts

are as alleged by the taxpayer to be set forth in the documents seized and lost. Second, in those instances where the taxpayer can offer credible evidence that the seized and lost record was properly maintained by the taxpayer, prior to seizure, and accurately reflected the facts that the taxpayer alleges it purports to reflect, the taxpayer is entitled to a presumption that the record would so reflect those alleged facts. The available inference and the presumption, where warranted, would affect only the facts alleged to have been reflected in the documents lost by the government; the ultimate burden of persuasion as to entitlement to a deduction would remain on the taxpayer. If the government wishes to avoid the risk of this slight modification of the normal rules concerning production and proof, it always has the option of furnishing the taxpayer with copies of any seized documents at the time of the seizure. Though the taxpayer could elect to make copies at its own expense, it need not impose this expense on itself, simply to insure against the government's inability to maintain the seized documents.[2]

Accordingly, on the remand which we now order, we ask the Tax Court to state with some specificity the deductions and recoveries of costs which the Gallery must negate or quantify by further proof before the Tax Court will accept the Gallery's proofs of loss in the Ackerman transactions. The Gallery then should be given an opportunity to furnish such proof by secondary evidence if it is available, and the Tax Court should consider whether to draw the inference, outlined above, arising from the government's loss of the records, and whether the taxpayer has shown entitlement to the presumption, outlined above, arising, in some circumstances, from such loss. If possible, the Tax Court should not deny in its entirety a $928,000 claim of loss because of insufficient proof of

cost adjustments that well may be relatively minimal in amount.

### Miscellaneous Expenses

 Crispo Gallery also contends that the Tax Court erred in its handling of the Gallery's deductions for miscellaneous business expenses. The Tax Court found:

> Petitioner has presented no evidence to substantiate expenses in 1986 in excess of those previously allowed or now conceded and has not offered any explanation of them in its brief. No additional deductions may be determined.

63 T.C.M. (CCH) at 2163.

The Gallery challenges these findings on the ground that, as of the time of the opinion, none of the 1986 expenses had been conceded or previously allowed. In fact, the 1986 business expenses were a part of the 1986 net operating loss proposed to be disallowed in its entirety in the notice of deficiency. As a result, Crispo Gallery argues, it was required to, and did, present evidence in support of its claimed deductions.

The record before us is sketchy regarding the treatment of the miscellaneous business expenses. We find nothing in the record indicating that any of the expenses were "previously allowed," a phrase we interpret to mean, allowed prior to trial. At another point in its opinion, the Tax Court stated: "After trial of this case, respondent conceded various expense deductions, including a deduction of $1,900.00 for shipping expenses, $407.22 for telephone expenses, and $725.00 as payment for services to Louis Weinel." *Id.* at 2157. Presumably these are the expenses "now conceded." After the opinion was filed on February 24, 1992, the Commissioner apparently conceded an additional $57,312.48 in expenses, and the Tax Court entered a decision on November 20, 1992 incorporating the conceded figures. Since

---

2. Judge Van Graafeiland, while recognizing the equitable considerations which prompt his colleagues' suggested inferences and presumptions, does not believe that they are warranted under the well established pertinent law. Judge Van Graafeiland believes that where, as here, the taxpayer's records were lost through no fault of its own, it should be permitted to present its case "with the best evidence available." *John Wana-*

*maker, Philadelphia v. Commissioner,* 62 F.2d 401, 402 (3d Cir.1932), *cert. denied,* 289 U.S. 738, 53 S.Ct. 657, 77 L.Ed. 1485 (1933); *see Allen v. Commissioner,* 117 F.2d 364, 367–68 (1st Cir.1941). However, inferences and presumptions should not give secondary evidence greater weight and credibility than the primary evidence itself would have received.

the $57,312.48 figure appears to have been an agreed computation pursuant to Tax Court Rule 155, the Gallery now has no cause to complain concerning the total amount of expenses allowed. *See Paccar, Inc., supra,* 849 F.2d at 399–400.

### Installment Sales

■ Crispo Gallery also contends that the Tax Court erred in denying installment sale treatment to the gain attributable to the 1987 Sotheby's auction, arguing that any profits realized on the auction should be deferred and recognized in the 1988 taxable year, when the proceeds from the sale actually were received. We agree that this portion of the Tax Court's decision must be vacated. A recitation of certain salient unchallenged facts will facilitate an understanding of our reasoning.

Between 1980 and 1984 Crispo Gallery became heavily in debt. In May 1984, Rosenthal and Rosenthal, a major creditor, secured general liens on all of the artwork that the Gallery possessed, and in March 1985, Rosenthal exercised its liens and seized the liened property. In 1984, the Department of Justice seized all of the Gallery's records. In 1986, the IRS placed liens on and seized the Gallery's property, including the artwork which Rosenthal previously had taken.

Until the middle of 1985, the Gallery had six employees; thereafter it had none. In November 1985, Mr. Crispo pled guilty to an information charging him with aiding and abetting corporate income tax fraud. He was imprisoned from April 1986 until July 1989. During 1987, the Gallery had no place of business, no employees, and no artwork for sale. In short, for all practical purposes, there was no ongoing Gallery business.

■ On October 20, 1987, the IRS entered into an agreement with Sotheby's for the sale of a number of the paintings it had seized, and the paintings subsequently were sold at public auction. The Commissioner contended in the Tax Court that the artwork sold was inventory and that, therefore, the Gallery could not report income from its sale under the installment method. *See* Code section 453(b)(2). Although section 453 does

not define the term "inventory," its definition in actions involving other sections of the Code, e.g., sections 1221(1) and 1231(b)(1)(A)–(B), is generally accepted and was utilized by the Tax Court in this case: "Property is inventory if it is 'held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.'" 63 T.C.M. (CCH) at 2159 (citing *Wood v. Commissioner,* 16 T.C. 213, 225–26 (1951)); *see also Swartz v. Commissioner,* 876 F.2d 657, 659 (8th Cir.1989), *cert. denied,* 494 U.S. 1006, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990); *Van Suetendael v. Commissioner,* 152 F.2d 654 (2d Cir.1945); 2A Rabkin and Johnson, *Federal Income, Gift and Estate Taxation* § 12.18 (1991). "Primarily" as used in this definition means "principally" or "of first importance." *Malat v. Riddell,* 383 U.S. 569, 572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966).

The Tax Court's error was not in defining the test for inventory, but in applying it. Citing *Daugherty v. Commissioner,* 78 T.C. 623, 1982 WL 11079 (1982), the Court said: "Because petitioner's artwork was seized in March 1985 when Rosenthal exercised its lien, petitioner's intent in holding the artwork at the time of its seizure determines its character at the time of sale." 63 T.C.M. (CCH) at 2159. The Court's reliance on *Daugherty* was misplaced. *Daughterty* involved the condemnation of real estate by the State of Maryland. There, the Court recognized the peculiar nature of a condemnation in the following language:

Once a taxpayer receives a notice of condemnation, he knows that his ownership of the property will be terminated. At that point there is, in essence, a constructive sale of the property with only the price to be determined later. In other words, the destiny of the sale to the governmental body is established.

*Daugherty, supra,* 78 T.C. at 638.

■ A lien, on the other hand, is not a sale, constructive or otherwise. It is simply a charge upon property as security for the payment of a debt. 53 C.J.S. *Liens* § 2; *Rohrbach v. Germania Fire Ins. Co.,* 62 N.Y. 47, 56 (1875). A lien holder does not acquire title until he satisfies statutory requirements,

which include notice of sale and a recognized right of lien satisfaction or redemption. *See* N.Y.Lien Law §§ 200–203.

■ The situation with regard to a federal tax levy is much the same. The government perfects its levy by sale and the taxpayer is given the right to make payment and redeem. 26 U.S.C. §§ 6331–6343. The taxpayer retains title until the statutory sale. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 211, 103 S.Ct. 2309, 2317, 76 L.Ed.2d 515 (1983).

In line with well-established authority, we hold that the character of the Gallery's property as inventory, *vel non,* must be determined as of the time it was sold. *See, e.g., Guardian Indus. v. Commissioner,* 97 T.C. 308, 316, 1991 WL 174147 (1991); *Cottle v. Commissioner,* 89 T.C. 467, 487, 1987 WL 45155 (1987); *Biedermann v. Commissioner,* 68 T.C. 1, 11, 1977 WL 3666 (1977). In making this determination, the Tax Court is not bound by the Gallery's original motivation or intent in purchasing the paintings, *see Arkansas Best Corp. v. Commissioner,* 485 U.S. 212, 223, 108 S.Ct. 971, 978, 99 L.Ed.2d 183 (1988); *Azar Nut Co. v. Commissioner,* 931 F.2d 314, 318 (5th Cir.1991), since a taxpayer's intent is subject to change. *See Glisson v. Commissioner,* 42 T.C.M. (CCH) 470, 477, 1981 WL 10681 (1981). Thus, although Crispo Gallery was the nominal owner of the paintings at the time the auctioneer's hammer was poised to fall, it does not follow necessarily that it was "holding" the paintings primarily, or principally, for sale to customers in the ordinary course of its business at that time or during the two previous years when the paintings were in the possession of either Rosenthal or the IRS and the Gallery was not selling paintings. Because the issue whether the Gallery was "holding" the paintings in the prescribed manner is substantially a question of fact, we remand to the Tax Court for findings on this issue and a decision concerning alleged installment sales based upon those findings.

We have considered appellant's remaining challenges to the decision of the Tax Court and find them to be without merit.

Affirmed in part; vacated and remanded in part.